U.S. DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

APR 21 2009

**FILED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

**UNITED STATES OF AMERICA**

v.                                    Cr. No.  09-CR-52-01-PB

**COLIN P. LINDSEY**

<u>**PLEA AGREEMENT**</u>

Pursuant to Rule 11(c)(1)(B) of the Federal Rules of Criminal Procedure, the United States of America, by its attorney, Thomas P. Colantuono, the United States Attorney for the District of New Hampshire, and the defendant, Colin P. Lindsey, and his attorneys, Michael Connolly and James Ball, enter into the following Plea Agreement:

1.  <u>**The Plea and Offenses**</u>.

The defendant agrees to waive prosecution by Indictment and plead guilty to an Information charging him with two counts of mail fraud, in violation of 18 U.S.C. §1341.  In exchange, the United States (or "the government") agrees to the sentencing stipulations that are identified in paragraph 6 of this agreement.

2.  <u>**Elements of the Offenses**</u>.

The defendant understands that if this case proceeded to trial the government would be required to prove the following elements beyond a reasonable doubt:

**Mail Fraud**

**First**, the defendant engaged in a scheme to defraud and to obtain money by false and fraudulent pretenses, representations or promises;

**Second**, the defendant knowingly and willfully participated in the scheme with the knowledge of its fraudulent nature and a specific intent to defraud; and

**Third**, in execution of that scheme, the defendant used or caused the use of mails as specified in the Information.[1]

3. **Offense Conduct**.

The government and the defendant agree that the offenses were committed as follows:

### Background

From approximately September 2003, to February 2008, the defendant was the owner, president and Chairman of the Board of Directors of Noble Trust Co. ("NTC"), a non-depository financial institution that was chartered under the laws of the State of New Hampshire. Among other things, the defendant provided investment advice and executed investment decisions on behalf of NTC's clients, to whom the defendant owed a fiduciary duty.

From approximately June 2004, to approximately September 2007, a number of NTC's clients' funds were held in a product that was created and managed by the defendant, the Noble Alternative Income Fund ("NAIF"). Each client for whom an NAIF account was established ("NAIF account holder") was told by the defendant that their money would be invested in an account that was earning annual interest payments of at least 12 percent, which, at the account holder's option, would be paid on a periodic basis or as a lump sum when the account was closed.

The defendant used funds held in the NAIF accounts to make separate loans to a company in Colorado, Sierra Factoring, Inc. ("Sierra"). Reportedly, Sierra used the loans it received from NTC to purchase accounts receivable from

---

[1]    United States v. Montiminy, 936 F.2d 626, 627 (1st Cir. 1991).

other companies and to make loans to small businesses.[2]

In general, in exchange for each fixed term, 12 percent loan, Sierra paid a one time up-front commission to NTC equal to 8 percent of the loan.   In addition, each NAIF account holder paid an annual management fee to NTC that was equal to 1.2 percent of the current market value of his/her account, as determined by the defendant.

The defendant caused account statements to be prepared and mailed to NAIF account holders four times each year.   The general purpose for each statement was to identify transactions that occurred in an account during the period covered by the statement, and to state the current market value of the account at the end of the period covered by the statement.

The promissory notes Sierra issued to NTC for each loan obligated Sierra to make periodic loan repayments to NTC.   If Sierra had fulfilled its obligations under the notes, NTC would have used the money it received from Sierra to make interest payments to NAIF account holders.

Sierra's last payment to NTC was made in August 2006. During the next few months, the defendant's confidence in Sierra waned and his communications with Sierra became more urgent and confrontational, and NTC's ability to make payments

---

[2]    A number of NTC's clients provided funds to the NAIF through irrevocable charitable remainder uni-trusts ("charitable trusts" or "trusts") that were created by the defendant.   For each trust, the defendant or NTC acted as the trustee. An irrevocable charitable trust can be created when a person or entity sells the ownership of a non-cash asset to a trust for which a non-profit organization is named as the ultimate beneficiary.   While the creator of the trust is alive, the income that is earned by the trust is paid to him.   The income that is earned by the trust is not subject to federal capital gains tax if: (a) the trust is not revoked, (b) it generates annual income to the creator of the trust in an amount that is not less than five percent or more than fifteen percent of the net fair market value of the trust's assets, and (c) the income is paid to the creator of the trust no less often than annually.   When the creator of the trust dies, the trust is dissolved and its assets are transferred to its ultimate charitable beneficiary.

to existing NAIF account holders appeared to be severely compromised.

In the fall of 2006, Sierra offered to settle its outstanding obligations to NTC by transferring $5 million in used equipment and $10 million in preferred stock in another company, DLR Funding, to NTC. The defendant rejected that offer and rather than disclose that Sierra had not been making payments, he sued Sierra.

Beginning in October 2006, the defendant used money that belonged to new customers of NTC to make payments to existing NAIF account holders, in violation of the duty he owed to the new customers.[3]   The defendant also formulated plans to replace the $15 million that was loaned to Sierra, using commissions from the sale of high value insurance policies.

### Count One

In particular, after Sierra stopped making payments to NTC in 2006, the defendant used approximately $781,000 that belonged to the new NTC customers who are identified below to make to make payments to existing NAIF account holders, in violation of the fiduciary duty the defendant owed to the new clients:

| New NTC Client | Date of Payment | Amount Paid | Existing NAIF Account Holder |
|---|---|---|---|
| Thackson Charitable Remainder Uni-Trust | 10/23/07 | $200,000 | LF Limited Partnership |
| DILO Livestock Charitable Remainder Uni-Trust ("CRT") | 01/03/07 | 30,000 | Ordway Investment Management Account ("IMA") |
| DILO Livestock | 01/10/07 | 17,500 | Sweeney CRT |
| Lane IMA | 02/13/07 | 2,000 | VFW Post 8541 |

---

[3]   In January 2008, the New Hampshire Banking Commission conducted an audit of NTC. During the audit, bank examiners determined that NTC used false information in quarterly, regulatory reports it submitted to the Banking Commission on behalf of NTC to conceal Sierra's true ability to repay the loans it received from NTC and the true value of the NAIF accounts.

| New NTC Client | Date of Payment | Amount Paid | Existing NAIF Account Holder |
|---|---|---|---|
| VFW District 20 IMA | 06/07/07 | 21,000 | Stylianos Sinanis |
| VFW District 7110 IMA | 06/07/07 | 25,000 | Stylianos Sinanis |
| James H. Mosier IMA | 06/07/07 | 40,250 | Stylianos Sinanis |
| TSL Hawke CRT | 06/07/07 | 28,000 | Stylianos Sinanis |
| Patricia Janoush IMA | 06/07/07 | 17,000 | Stylianos Sinanis |
| Texas VFW Post 8550 | 06/07/07 | 10,000 | Stylianos Sinanis |
| Merrill R. Jones IMA | 06/07/07 | 4,750 | Stylianos Sinanis |
| David Fedeles IMA | 06/07/07 | 5,000 | Stylianos Sinanis |
| Carpenter IMA Manager Account | 06/07/07 | 5,000 | Stylianos Sinanis |
| Michael Gaulden CRT | 07/18/07 | 53,700 | Mendola IMA |
| Michael Gaulden CRT | 07/31/07 | 100,000 | Arnone IMA |
| Michael Gaulden CRT | 07/31/07 | 16,700 | Shurtleff IMA |
| John L. Trottnow Revocable Trust ("RT") | 09/17/07 | 10,000 | Holden IMA |
| Trottnow RT | 09/17/07 | 10,000 | VFW Post 7782 |
| Trottnow RT | 09/17/07 | 17,000 | VFW Post 7768 |
| Trottnow RT | 09/17/07 | 2,475 | VFW Post 9078 |
| Trottnow RT | 09/17/07 | 13,000 | Travis County Council Flag Fund IMA |
| Trottnow RT | 09/17/07 | 6,000 | Young America Creative Patriotic Art |
| Trottnow RT | 09/18/07 | 101,189 | Hopkins IMA |

| New NTC Client | Date of Payment | Amount Paid | Existing NAIF Account Holder |
|---|---|---|---|
| Trottnow RT | 09/19/07 | 46,000 | VFW 20 and 7110 |
|  |  | **$781,564** |  |

During that period, the defendant concealed the fact that he used money that belonged to new clients to make payments to existing NAIF account holders by causing misleading quarterly account statements to be mailed to each new client, which falsely reported that the current market value of each account was at least equal to the amount of money that was originally placed in it.

Count Two

From approximately August 2006 to the present, the defendant has been a principal of an insurance agency in Manchester, New Hampshire, Balcarres Group, LLC ("Balcarres"). Balcarres sold a number of high value life insurance policies for Phoenix Life Insurance Company, AXA Insurance Company, and Penn Life Insurance Company ("the insurance companies").

The face value of a high value life insurance policy ("policy") is between $5 million and $15 million. To qualify for a policy an applicant must, among other things, be at least 70 years old, have a personal financial net worth that is at least equal to the value of the policy he intends to purchase, and have neither an agreement nor an intention to sell the policy at the time he applies for it. Assuming that a policy is lawfully and properly issued, it may, under the appropriate circumstances, be sold for a substantial sum of money in the so-called "Life Settlement secondary market."

There are a number of grounds upon which an insurance company is entitled to rescind a policy during the first two years of the policy's existence. Thereafter, an insurance company's ability to rescind a policy is substantially restricted. Accordingly, a policy's market value substantially increases after its "two year contestability" period expires.

The owner of a policy must pay premiums totaling several hundred thousand dollars each year. The premiums can be paid by an insurance premium finance company that is approved by an insurance company. The finance company is repaid, with interest, when the policy is sold or from the benefits of the

policy when the insured dies.

When an NTC customer purchased a policy through Balcarres, the insurance company paid an up-front commission to Balcarres that ranged from approximately 80% to 112% of the premiums that are paid during the first year of the policy's existence.[4]

In addition to the conduct described in Count One, the defendant attempted to replace the impaired Sierra investments before the NAIF account holders learned their money had been lost, through the sale of high value insurance policies, some of which were fraudulent.  In that regard, in approximately August 2006, the defendant agreed to pay a fee to a resident of Odessa, Florida ("the Florida resident") each time the Florida resident referred a person who ultimately purchased a policy through Balcarres.   To earn his fee, the Florida resident was required to provide financial statements and other documents to the defendant to demonstrate that an applicant for the policy had a personal financial net worth that was at least equal to the face value of the policy he/she wished to purchase.

From approximately October 2006, to approximately October 2007, the Florida resident induced a number of people to submit applications for policies to the insurance companies, in part, by assuring the potential applicants that the premiums for their policy would be entirely financed by NTC or other entities.

Before each application was submitted, the defendant, the Florida resident, and each applicant agreed that the applicant's policy would be owned by a trust, and that the beneficial interest in the trust would be sold to NTC for an agreed upon amount of money that would be paid to the insured by the Florida resident.

In addition, the Florida resident provided materially

---

[4]     Some of those policies were owned by Irrevocable Life Insurance Trusts ("ILIT") for which the defendant or NTC acted as the trustee.  An ILIT is typically created for estate planning purposes.  Its only asset is a life insurance policy.  The benefits of the policy are paid to the trust's beneficiary when the person who created the trust, the grantor, dies.  The beneficiary is not required to pay estate taxes on the benefits.

false information regarding each applicant's personal financial status to the defendant. At some point, the defendant came to know that the applicants' personal financial information was falsified. Nevertheless, he caused the information to be mailed with applications for policies to the insurance companies.

Through that conduct, the defendant received commissions in the following amounts:

| Insurance Company | Policy Number | Balcarres' Commission | Amount Paid to Florida Resident | Net to Balcarres |
|---|---|---|---|---|
| AXA | 157215761 | $439,840.00 | $0 | $439,840.00 |
| Phoenix Phoenix | 97520809 97519990 | 884,075.32[5] | 110,000 250,000 | 524,075.32 |
| AXA | 157218193 | 402,450.00 | 200,000 | 202,450.00 |
| Phoenix | 7521964 | 511,816.80 | 300,000 | 211,816.80 |
| Penn | 8192490 | 1,035,000.00 | 300,000 | 735,000.00 |
| Phoenix | 97521740 | 170,367.47 | 90,000 | 80,367.47 |
| Penn | 8191171 | 154,530.00 | 50,000 | 104,530.00 |
| Phoenix | 97521456 | 483,010.00 | 200,000 | 283,010.01 |
| Phoenix Phoenix | 97524167 97520807 | 607,464.00 499,209.72 | 125,000 200,000 | 482,464.00 299,209.72 |
| Phoenix | 97523067 | 411,763.05 | 300,000 | 111,763.05 |
| | | **$5,599,526.36** | **$2,125,000** | **$3,474,526.36** |

The defendant used the commissions that were retained by Balcarres' to (a) make periodic payments to some NAIF account holders, (b) return money to NAIF account holders when their accounts closed, and (c) finance (through Balcarres) high value policies that were purchased by other people.

4.  **Maximum Penalties**.

The defendant understands that the maximum penalties for the offenses are:

---

[5]   $884,075.00 commission for two policies.

A.  A term of imprisonment of 20 years (18 U.S.C. §§ 1341 and 12 U.S.C. §3401(1);

B.  A fine of $250,000, or twice gross gain or gross loss caused by the offense, whichever is greater (18 U.S.C. §§ 1341, 3571(b)(3) and 3571(d));

C.  A possible additional fine to pay the costs to the government of probation (U.S.S.G. § 5E1.1(I));

D.  A mandatory special assessment of $200.00 ($100.00 for each offense of conviction), which the defendant agrees to pay at or before the time of sentencing; and

E.  A term of supervised release of not more than five years.  The defendant understands that his failure to comply with any of the conditions of supervised release may result in revocation of supervised release, requiring him to serve in prison all or part of the term of supervised release, with no credit for time already spent on supervised release (18 U.S.C. §3583).

5.  **Sentencing and Application of the Sentencing Guidelines**.

The defendant understands that the Sentencing Reform Act of 1984 applies in this case and that the Court is required to consider the United States Sentencing Guidelines as advisory guidelines.  The defendant further understands that he has no right to withdraw his guilty pleas if the applicable advisory guideline range or his sentence is other than what he anticipated, except as expressly provided in this Plea Agreement.

The defendant also understands that the United States and the United States Probation Office shall:

A.  Advise the Court of any additional, relevant facts that are presently known or may subsequently come

to their attention;

B.   Respond to questions from the Court;

C.   Correct any inaccuracies in the pre-sentence report; and/or

D.   Respond to any statements made by the defendant to a probation officer or to the Court.

The defendant understands that the United States and the Probation Office may address the Court with respect to an appropriate sentence to be imposed in this case.

The defendant is aware that any estimate of the probable sentence or the probable sentencing range relating to him pursuant to the advisory Sentencing Guidelines that he may have received from any source is only a prediction and not a promise, and is not binding on the United States, the Probation Office, or the Court, except as expressly provided in this Plea Agreement.

6. **Sentencing Agreements**.

The defendant understands that the Court will, with the aid of the pre-sentence investigation report, determine the facts that are relevant to sentencing.

Pursuant to Fed. R. Crim. P. 11(c)(1)(B) and U.S.S.G. §6B1.4, the government and the defendant agree:

A.   For purposes of U.S.S.G. §2B21.1(b)(1)( ), the loss caused by the offenses is greater than $2.5 million and less than $7 million; and

B.   For purposes of U.S.S.G. §3B1.3, the offenses involved the defendant's abuse of a position of

trust.

The defendant understands that the government may argue that other sentencing enhancements should be applied in this case, and he is permitted to object to them.

The government will not request an upward departure or variance from the advisory guideline sentencing range, as determined by the sentencing court.

The defendant may request a downward departure and/or variance from the advisory guideline sentencing range, as determined by the sentencing court.

The government and the defendant are free to make recommendations with respect to terms of imprisonment, fines, conditions of supervised release, and any other penalties, requirements, and conditions of sentencing as each party may deem lawful and appropriate unless such recommendations are inconsistent with the terms of this Plea Agreement.

The defendant understands that the sentencing court is not bound by the foregoing agreements but with the aid of a pre-sentence report, will determine the facts relevant to sentencing. The defendant understands that if the sentencing Court does not accept the foregoing agreements, such rejection by the Court will not be a basis for him to withdraw his pleas of guilty.

7.   **Acceptance of Responsibility**.

The government agrees that it will not oppose an appropriate reduction in the defendant's Adjusted Offense Level, under the Sentencing Guidelines, based upon the defendant's apparent prompt recognition and affirmative acceptance of responsibility for the offense. The government, however, may oppose any adjustment for Acceptance of Responsibility if the defendant:

A.   Fails to admit a complete factual basis for the plea at the time he is sentenced or at any other time;

B.   Challenges the "Offense Conduct" as described in paragraph 3 of this Agreement at any time after the pleas are entered;

C.   Denies involvement in the offense;

D.   Gives conflicting statements about that involvement or is untruthful with the Court, the United States or the Probation Office;

E.   Fails to give complete and accurate information about the defendant's financial status to the Probation Office;

F.   Obstructs or attempts to obstruct justice, prior to sentencing;

G.   Has engaged in conduct prior to signing this Plea Agreement which reasonably could be viewed as obstruction or an attempt to obstruct justice, and has failed to fully disclose such conduct to the United States prior to signing this Plea Agreement;

H.   Fails to appear in court as required;

I.   After signing this Plea Agreement, engages in additional criminal conduct;

J.   Attempts to withdraw the plea of guilty;

K.    Within fourteen days of pleading guilty to the offenses, fails to submit a sworn, truthful and complete personal financial affidavit to the government and the New Hampshire Banking Commissioner (as Liquidator for Noble Trust Company) that: (1) identifies the defendant's current direct and/or indirect ownership interests in all assets, property and/or money, (2) identifies all transfers of any such asset, property and/or money that occurred within four years of the date the financial statement is sworn to and signed by the defendant; and (3) specifically identifies the assets, property and/or money that were transferred, and the identity of the person and/or entity to whom the transfer(s) was made; and/or

L.    Within forty-five calendar days of pleading guilty to the offenses, fails to assent and agreed to a civil judgment in the Liquidation Proceeding in favor of the New Hampshire Banking Commissioner (in his capacity as NTC's Liquidator), against Balcarres, through which the ownership of all assets, property and money that are owned by Balcarres are transferred to the New Hampshire Banking Commissioner (in his capacity as NTC's Liquidator), in partial satisfaction of the Liquidator's claims against the defendant and Balcarres.

If the defendant's offense level is sixteen or greater, and he has assisted the United States in the investigation or prosecution of the defendant's own misconduct by timely notifying the United States of his intention to enter a plea of guilty, thereby permitting the United States to avoid preparing for trial and permitting the United States and the Court to allocate their resources efficiently, the United States will move, at or before sentencing, to decrease the defendant's base offense level by an additional one level pursuant to U.S.S.G. § 3E1.1(b).

The defendant understands and agrees that he may not withdraw

his guilty plea if, for any of the reasons listed above, the government does not recommend that he receive a reduction in the defendant's sentence for acceptance of responsibility.

The defendant also understands and agrees that the Court is under no obligation to reduce the offense level if it finds that he has not accepted responsibility.

8. **Substantial Assistance**.

If the defendant provides substantial assistance in the investigation or prosecution of another person who has committed an offense, the government may file a motion pursuant to U.S.S.G. §5K1.1 and 18 U.S.C. §3553(e) advising the sentencing Court of all relevant facts pertaining to that determination and requesting the Court to sentence the defendant in light of the factors set forth in §5K1.1(a)(1)-(5).

The defendant understands that the determination of whether to file such a motion rests solely with the United States.  This means that the United States may or may not file a motion under U.S.S.G. §5K1.1 or 18 U.S.C. §3553(e).  The decision whether to file such a motion will depend on the United States' evaluation of any assistance provided by the defendant.  The defendant also understands that even if such a motion is filed, the Court is under no obligation to grant or act favorably upon the motion.  It is understood that the sentence to be imposed remains within the discretion of the sentencing court.

9.   **Restitution and Dischareability**.

The defendant understands that he will be required to make restitution to the victims of the offenses.  <u>See</u> 18 U.S.C. §§ 3663 and 3663A.  The defendant also acknowledges and consents that his obligations to pay restitution shall not be dischargeable in any case commenced by or against him under the United States Bankruptcy Code (11 U.S.C. §101 et seq.).

10.   **Waiver of Trial Rights and Consequences of Plea**.

The defendant understands that he has the right to be represented by an attorney at every stage of the proceeding and, if necessary, one will be appointed to represent him.  The defendant also understands that he has the right:

A.   To plead not guilty or to maintain that plea if it has already been made;

B.   To be tried by a jury and, at that trial, the right to the assistance of counsel;

C.   To confront and cross-examine witnesses against him;

D.   Not be compelled to provide testimony that may incriminate him; and

E.   To compulsory process for the attendance of witnesses to testify in his defense.

The defendant understands that by pleading guilty he waives and gives up those rights and that if a plea of guilty is accepted by the Court, there will not be a trial of any kind.

The defendant understands that if he pleads guilty, the Court may ask him about the offense, and if he answers any of those

questions falsely his answers may later be used to prosecute him for perjury or making false statements.

11. **Use of Certain Information**.

Provided the defendant gives truthful, accurate and complete information, the government agrees, pursuant to U.S.S.G. § 1B1.8(a), that any self-incriminating information provided by the defendant which was not known by the government, or which the government could not establish by a preponderance of the evidence at the time of the defendant's briefings, shall not be used in determining the advisory guideline range. This Plea Agreement is subject to the § 1B1.8(b) exceptions and reserves to the government the ability to make derivative use of the defendant's statements.

12. **Acknowledgment of Guilt; Voluntariness of Plea**.

The defendant acknowledges that he:

A.  Is entering into this Plea Agreement and is pleading guilty freely and voluntarily because he is guilty;

B.  Is entering into this Plea Agreement without reliance upon any discussions with the government and without promise of benefit of any kind except as described in this Plea Agreement;

C.  Is entering into this Plea Agreement without threats, force, intimidation, or coercion of any kind;

D.  Understands of the nature of the offenses to which he is pleading guilty, including the penalties provided by law; and

E.   Is completely satisfied with the representation and advice he has received from his undersigned attorneys.

13. **Scope of Agreement**.

The defendant understands and agrees that this Agreement is limited to the undersigned parties and cannot bind any other federal authority, or any state or local authority, including the Liquidator, and shall not be used in any way to prejudice, limit or otherwise restrict the Liquidator's claims regarding the defendant's civil liability for the offense conduct and losses that are identified in §3 of this agreement.  The defendant acknowledges that no representations have been made to him with respect to any civil or administrative consequences that may result from this plea of guilty, because such matters are solely within the discretion of the specific administrative or governmental entity involved. Finally, the defendant acknowledges that this Agreement has been reached without regard to any civil tax matters that may be pending or which may arise involving him.

14. **Satisfaction of Federal Criminal Liability; Breach**.

The defendant's guilty plea, if accepted by the Court, will satisfy any federal criminal liability of the defendant in the District of New Hampshire as a result of his conduct which forms the basis of the Information in this case.

The defendant also understands that if, before sentencing, he violates any term or condition of this Agreement, engages in any criminal activity, or fails to appear for sentencing, the government may void this Agreement.  Should either party violate

the terms of this Agreement, the other party shall have the option
of declaring the Agreement null and void.

15. **Waivers**.

    A.    **Appeal and Collateral Review**.

    The defendant is aware that he has the right to challenge his
sentence and guilty plea on direct appeal.  He is also aware that
he may, in some circumstances, be able to argue that his guilty
pleas should be set aside, or his sentence be set aside or reduced,
in a collateral challenge (such as pursuant to a motion under 28
U.S.C. § 2255 or § 2241).

    By entering into this Plea Agreement, the defendant knowingly
and voluntarily waives any right to appeal or to collaterally
challenge:

    1.    His guilty pleas and any other aspect of his
convictions, including, but not limited to, any
rulings on pretrial suppression motions or any
other pretrial dispositions of motions and issues;
and

    2.    The defendant's sentence imposed by the Court if
within the guideline range determined by the Court,
or lower, or the Court's imposition of the minimum
mandatory sentence.

    The defendant's waiver of rights to appeal and to bring
collateral challenges shall not apply to appeals or challenges

based on new legal principles in First Circuit or Supreme Court cases decided after the date of this Plea Agreement which are held by the First Circuit or Supreme Court to have retroactive effect. The defendant's waiver of the right to collateral review does not extend to claims that the plea was unknowing or involuntary or to claims that he received ineffective assistance of counsel in the negotiation of the plea or plea agreement.

This Plea Agreement does not affect the rights or obligations of the United States as set forth in 18 U.S.C. § 3742(b), and the United States therefore retains its appeal rights.

     B.    **Freedom of Information and Privacy Acts.**

The defendant hereby waives all rights, whether asserted directly or through a representative, to request or receive from any department or agency of the United States any records pertaining to the investigation or prosecution of this case, including without limitation any records that may be sought under the Freedom of Information Act, 5 U.S.C. §552, or the Privacy Act of 1974, 5 U.S.C. §522a.

16. **No Other Promises**.

The defendant acknowledges that no other promises, agreements, or conditions have been entered into other than those set forth in this Plea Agreement or revealed to the Court, and none will be entered into unless set forth in writing, signed by all parties, and submitted to the Court.

17. **Final Binding Agreement**.

None of the terms of this Plea Agreement shall be binding on the United States until this Plea Agreement is signed by the defendant, a lawyer who represents the defendant and by the United States Attorney for the District of New Hampshire, or an Assistant United States Attorney.

18. **Agreement Provisions Not Severable.**

The government and the defendant understand and agree that if any provision of this Plea Agreement is deemed invalid or unenforceable, as to the government and the defendant, then the entire Plea Agreement is null and void and no part of it may be enforced.

Thomas Colantuono
United States Attorney

By: _____     Date: 4-21-09
    Robert M. Kinsella
    Assistant U.S. Attorney

By: _____     Date: 4-21-09
    Elizabeth Baker
    Special Assistant United States Attorney

    I hereby certify that I have read this 21-page Plea Agreement,
I have fully discussed it with my lawyers and I fully understand
and accept its terms.

_____     Date: 4-21-09
Colin P. Lindsey, Defendant

    We have read and explained this 21-page Plea Agreement to our
client, Colin P. Lindsey, and he has advised us that he understands
and accepts its terms.

_____     Date: 4/21/09
Michael Connolly, Esq.
Attorney for Colin Lindsey

_____     Date: 21-Apr-09
James Ball, Esq.
Attorney for Colin Lindsey